# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: | Case No. F13-00354-GS |
| FREDERICO Z. ANTHONYS, | Chapter 7 |
| Debtor. | |
| UNITED STATES TRUSTEE, | Adv. No. F14-90011-GS |
| Plaintiff, | |
| v. | |
| FREDERICO Z. ANTHONYS, | |
| Defendant. | |

## MEMORANDUM DECISION

In this adversary proceeding, the United States Trustee ("UST") seeks denial of debtor

Frederico Z. Anthonys' discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(4) and (a)(5).[1]

After trial of this matter held on June 29, 2015, the court finds in favor of the UST, and will

enter judgment denying the debtor's discharge pursuant to 11 U.S.C. § 727(a)(4).

---

[1] Unless otherwise specified, all "§" and "Code" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All references to "Rule" are to the Federal Rules of Bankruptcy Procedure, unless otherwise noted. References to "ECF No." are to the ECF number as assigned on the docket for documents filed electronically through CM/ECF in Debtors' above-referenced bankruptcy case, and references to "AECF No." are to the ECF number as assigned on the docket for documents filed in the instant adversary proceeding.

### CASE BACKGROUND

The debtor filed a "bare bones" chapter 13 petition on May 22, 2013, with the assistance of counsel, attorney Jason Crawford.[2]  That case was dismissed on June 6, 2013 for the debtor's failure to pay the filing fee.  The following month, on July 18, 2013, the debtor filed a second chapter 13 petition on his own behalf, again without schedules, statements, or a chapter 13 plan.  Mr. Crawford subsequently appeared in the main case as the debtor's counsel on December 17, 2013.

### I.    The Debtor's Schedules and Statements.

The debtor, acting pro se, filed his schedules and statements on September 16, 2013, while his case was pending under chapter 13.[3]  His Schedule A listed only an interest in a residence on Marlette Court in North Pole, Alaska, valued at $289,000.00 and encumbered by a mortgage in favor of First National Bank Alaska ("FNBA") for $110,000.00.[4]  This property has since been foreclosed by FNBA.

The debtor's Schedule B listed personal property with a total value of $5,349.00.  For automobiles, the debtor listed a 1999 Malibu worth $2,100.00, located at his residence.[5]  On a continuation sheet, the debtor disclosed one additional vehicle, a "Broken 80 Cutlass," valued at $100.00, also located at his residence.[6]

---

[2] *In re Anthonys*, Case No. F13-00274-GS.  The court takes judicial notice of its docket in the original bankruptcy filing, Case No. F13-00274-GS, and the underlying main case, Case No. F13-00354-GS.  Fed. R. Evid. 201.

[3] ECF Nos. 19, 20 (UST's Exs. 4, 5).

[4] ECF No. 19 at 3 (UST's Ex. 4 at 23).

[5] *Id.* at 6 (UST's Ex. 4 at 26).

[6] *Id.* at 8 (UST's Ex. 4 at 28).

On his Statement of Financial Affairs, the debtor responded "none" to question 10.a, which requires the disclosure of "all other property . . . transferred either absolutely or for security within **two years** immediately preceding the commencement of this case."[7]

## II.   The Undisclosed Assets and Debtor's § 341 Testimony.

The debtor's initial meeting of creditors was held on August 16, 2013. At this meeting, the debtor stated that he had no legal counsel, nor did he have any source of income. The meeting was continued because the debtor had not yet filed his schedules and statements.

On September 27, 2013, eleven days after filing his schedules and statements, the debtor attended a continued meeting of creditors. At this meeting, the chapter 13 trustee, Larry Compton, asked him if he had listed all of his assets and creditors. The debtor responded, "Yes."[8]  The debtor was then examined about two parcels of real property that were not listed on his schedules. First, he was asked whether he owned a "lot next door" to his house. The debtor said he did not; the lot had been sold in 2011.[9]  When it was pointed out to the debtor that this sale was not reflected in the public records, he explained that he had sold it to "Mrs. Byam," although she "probably has not recorded the land."[10]  The debtor stated he had sold the parcel to her because he owed her money for some work she had done for him. However, he also indicated that she had paid him some money in the transaction,

---

[7] ECF No. 20 at 5 (UST's Ex. 5 at 48)(emphasis in original).

[8] UST's Ex. 10 at 4:8-19 (*Transcript of Digitally Recorded 341 Meeting of Creditors - Sept. 27, 2013).*  The *Transcript* reflects that the debtor appeared at this meeting *pro se*. Attorney Jason Crawford, who had filed the debtor's prior chapter 13 petition, was also present at the meeting, but on behalf of his firm, Gazewood & Weiner, PC, rather than on the debtor's behalf. *Id.* at 2.

[9] *Id.* at 6:16-21.

[10] *Id.* at 6:17-7:1.

saying, "[s]he gave me partial.  But it was mostly a partial payment for the money that I owe her."[11]

Six days after the debtor gave this testimony, a quitclaim deed was recorded in the Fairbanks Recording District which reflected that the debtor had transferred his interest in Lot 4, Block 3, Kingsmen Estates, First Addition ("the Kingsmen property") to Anna Byam.[12]  The quitclaim deed was dated August 12, 2011, and notarized for that same day.  This date falls within two years of the date the debtor filed his bankruptcy petition.

At the same creditors' meeting held on September 27, the debtor was also asked about another parcel of real property located in North Pole, Alaska ("the Morning Star property").  A warranty deed produced at the meeting reflected that the debtor and another individual, James Schuster, became co-owners of the property in 2003.  When asked if he was an owner of record for this property, the debtor attempted to qualify this term, responding that he was "maybe a co-owner."[13]  On further questioning, he conceded that he was an owner, but explained that he hadn't listed the parcel on his schedules because he misunderstood the questions.[14]  He also stated that there had been no transfers with regard to this property since 2003.

The debtor was questioned further about the Morning Star property at the continued § 341 meeting held November 1, 2013.  He estimated the property was worth about

---

[11] *Id.* at 7:16-19.

[12] UST's Ex. 9.

[13] UST's Ex. 10 at 11:2-7.

[14] *Id.* at 11:22-12:7.

$20,000.00, and said he purchased it with Mr. Schuster as a business partnership.[15]  When asked why he hadn't listed this property on his schedules, he responded that he wasn't sure, but thought it might have been "because I was under the understanding the transaction took place so long ago and that I didn't have to list it."[16]  He again tried to qualify his interest in the property as a co-owner, but ultimately conceded he still had an interest in that property.

On February 10, 2014, the debtor's ex-wife moved to convert the chapter 13 proceeding to a liquidation under chapter 7.  On February 27, 2014, the court conducted a hearing on several matters in the case, including the motion to convert.  The court orally granted the motion, although the order converting the case was not entered until March 5, 2014.[17]  On the very same day as the court heard the motion to convert, a quitclaim deed transferring the debtor's interest in the Morning Star Property to Anna Byam was recorded in the Fairbanks Recording District.[18]  This quitclaim deed is also dated, and the signature notarized, for August 12, 2011, the same date reflected on the quitclaim deed for the Kingsman property.  No explanation has ever been offered for why the quitclaim deeds were recorded years after the transfer, or why the deeds were recorded months apart despite having been executed on the same date.

In addition to the two undisclosed parcels of real property, the debtor had an interest in several vehicles at the time he filed his petition.  He disclosed two vehicles on his Schedule B, a 1980 Cutlass and a 1999 Malibu, which, per the document, were both located

---

[15] UST's Ex. 11 at 9:19-10:12 (*Transcript of Digitally Recorded 341 Meeting of Creditors - Nov. 1, 2013*).

[16] *Id.* at 10:13-19.

[17] The chapter 13 standing trustee, Mr. Compton, was also appointed the chapter 7 trustee.

[18] UST's Ex. 7.

at his residence on Marlette Court.  At the  November 1, 2013 § 341 meeting of creditors the trustee asked him about other specific vehicles titled in his name.  In response, the debtor stated that an '87 Cutlass belonged to his wife and was in her possession.  He also stated that a '76 Chevy was "at the lot," that it didn't work and that it was basically a "junk car."  He confirmed that another Olds Cutlass, a '78 Ford, and an '82 Pontiac were "at the lot" or "on the property," but also characterized these as junk vehicles.  He also stated that the '82 Pontiac belonged to his wife.[19]  During the questioning, the trustee admonished the debtor that he should have listed assets worth  $10.00, or at least "anything over $50 bucks," on his schedules.[20]  The trustee also noted that the junk cars might be worth about $100.00 each from a recycler, which, when combined, could result in some "real money."[21]  The debtor responded that he had thought about that.[22]

In spite of the discussions at the § 341 meetings about the undisclosed lots and vehicles, the debtor never amended his Schedules or Statement of Financial Affairs to correct these omissions.

## III.    The UST's Complaint and Debtor's Answer.

The UST initiated this adversary action on June 20, 2014.  The UST seeks denial of discharge for the debtor's failure to list his interest in the Kingsman and Morning Star properties, or, alternatively, his failure to disclose the prepetition transfer of those parcels. The UST also seeks to deny the debtor his discharge for his failure to schedule a 1983 Olds Cutlass, a 1987 Olds Cutlass, a 1996 GMC Sierra, a 1976 Chevy Truck, a 1980 Olds Cutlass,

---

[19] UST's Ex. 11 at 15:7-16:24.

[20] *Id.* at 15:4-5.

[21] *Id.* at 16:14-18.

[22] *Id.*

a 1976 Ford Truck, a 1982 Pontiac J2000, and a 1978 Honda Accord.[23]  The UST contends

the debtor violated § 727(a)(2) by concealing his interest in these assets and by transferring

the two parcels of real property with the intent to hinder, delay, or defraud creditors or the

estate.  The UST also contends denial of discharge is appropriate under § 727(a)(4) on the

grounds that the debtor knowingly and fraudulently made false statements on his schedules

and statements by failing to disclose these assets or the prepetition transfers.  Finally, the

UST seeks denial of discharge under § 727(a)(5) for the debtor's failure to explain the

disposition of the undisclosed vehicles.

Shortly after commencement of the adversary proceeding, the debtor sought to remove

Mr. Crawford as his attorney.  The court granted the motion to remove counsel on July 15,

2014.  Another attorney, Valerie Therrien, subsequently filed an answer on the debtor's

behalf in this adversary action.[24]  In his Answer to Complaint to Deny Discharge ("Answer"),

the debtor admitted that he had an interest in the two parcels of real property but that he

quitclaimed those parcels to Ms. Byam prepetition.[25]  With reference to the vehicles, the

debtor responded that he has never owned a 1983 Cutlass, or a 1996 GMC Sierra.  His

Answer also stated that the 1987 Cutlass, although titled to him, was in his ex-wife's

possession, and further averred that the 1976 Chevy Truck, the 1980 Olds Cutlass, the 1982

Pontiac J2000, and the 1978 Honda Accord had no value and had been towed away at the

request of FNBA.[26]  The Answer did not address the 1976 Ford Truck.

---

[23] *Complaint to Deny Discharge* ("*Complaint*"), AECF No. 1 (UST Ex. 1) at 3-4 .

[24] Ms. Therrien moved to withdraw from representation on March 24, 2015.  The motion was granted
as unopposed.

[25] UST's Ex. 2 (AECF No. 17).

[26] FNBA held the mortgage on the debtor's residence. The bank obtained relief from stay and has now
acquired the property through foreclosure.  *See Order Granting Relief From Stay*, entered Apr. 8, 2014 (ECF

## IV.    The Debtor's Testimony at Trial.

Trial of this matter was held on June 29, 2015.  The debtor appeared and testified on all matters.  The chapter 13/7 trustee, Mr. Compton, also testified.  Ms. Byam, however, was not called as a witness, and no testimony from her was presented regarding the transfers of the Kingsman or Morning Star properties, or the subsequent recording of the two quitclaim deeds.

### A.    The Debtor's Background and Educational Level.

The debtor testified that he is self employed, and works in consulting.  He has completed high school and taken some college courses.  He stated that, in the past, he has operated restaurants on his own.

### B.    The Transfers of Real Property.

The debtor testified that he transferred both the Kingsmen Estates and Morning Star parcels to Anna Byam in August 2011.  He explained that he made these transfers to pay Ms. Byam for childcare/daycare services she had provided to him after his wife moved out.  At the time of the transfers, he and his wife were separated.  They filed for divorce in 2012.  The divorce has been very contentious.  The debtor stated that his children lived with him until August 15, 2012.

The debtor testified that he had a professional relationship with Ms. Byam at the time he transferred the properties to her, though he admitted that she was currently living with him.[27]  According to the debtor, she gave his children both care and schooling, working more than ten hours per day.  The properties were quitclaimed to her in exchange for services

---

No. 101); *Rescission of Proof of Claim*, filed Sept. 11, 2014 (ECF No. 139).

[27] It is unclear from the evidence presented when Ms. Byam began living with the debtor.

rendered.  The debtor stated that he wanted to come up with a way to repay her for her services, and that he and Ms. Byam came up with this arrangement.  His explanations as to how he determined the value of her services, or the value of the properties at the time of transfer, were unclear and lacked detail.  He testified that he figured a rate of $20.00 per hour for Ms. Byam's services, which were provided over a two-year period.

Although the debtor said the transfers were made to repay Ms. Byam, he again stated that she gave him some money in exchange as part of the transaction.  He characterized it as "tip money" that she had, not even $1,000.00.  He believed she gave him the money because he was going through hard times and she thought she was getting the best end of the deal.  Yet, he also stated that they had looked at the fair market value of the property and figured it wouldn't cover her two years of service.

The debtor was asked how he calculated the value of the two properties.  He said neither one was worth much.  He testified that the Morning Star property was an empty, swamp lot.  When asked if he recalled his testimony at the § 341 meeting to the effect that he had purchased it as a business investment, he could not remember his prior testimony.  As for the Kingsman property, the debtor testified that it was "worth nothing," and that he recalled paying just $2,000.00 for it.

The debtors' testimony regarding the value of the two lots was contradicted by Property Summaries for the parcels introduced into evidence by the UST.[28]  These summaries confirmed that both parcels consisted of vacant land, but reflected that the tax assessed value was $47,558.00 for the Morning Star property and $11,044.00 for the Kingsmen property.  The assessed values have not changed for either property since 2011, when the debtor

---

[28] UST's Exs. 6, 8.

transferred his interest in the two parcels to Ms. Byam.  Using these assessed values, the debtor transferred real property interests worth $34,823.00 to Ms. Byam in 2011.[29]

When asked why he had not listed the transfers of the two parcels on his Statement of Financial Affairs, the debtor explained that the transfers occurred more than two years from the date he filed that document.  He said he filled out and filed the Statement of Financial Affairs in September 2013, while the transfer occurred in August, 2011.  Yet, he also testified that he did not recognize this document, or the Schedules, because they appeared to have been prepared on a computer, and he would have hand-printed the information on these documents.  He also challenged the authenticity of his signature on both.  His trial testimony in this respect contradicts his prior testimony at the September 27, 2013 § 341 meeting, wherein he stated that he had signed these documents, and affirmed that everything listed on them was true and correct, to the best of his knowledge.[30]  The court gives this earlier testimony more weight, because it was given just eleven days after the Schedules and Statement of Financial Affairs were filed.

### C.    The Vehicles.

The debtor's trial testimony regarding the vehicles was inconsistent with his Answer. He again stated that he had never owned an 1983 Oldsmobile.  However, he said the 1978 Honda, and the 1976 Chevy truck were his former wife's vehicles, as was the 1987 Cutlass. He also stated that the 1987 Cutlass was at his former wife's residence.  He also "believed" that the 1976 Chevy truck was on his property and then removed, but again couldn't provide

---

[29] This figure includes the full assessed value for the Kingsmen property ($11,044.00), and half of the value for the Morning Star property ($23,779.00), because the debtor was a 50% co-owner of this latter parcel.

[30] *See* UST's Ex. 10 at 4:1-10.

any details.  He testified that the 1982 Pontiac J2000 had been removed from his property a while back, but could not provide further specifics.

The debtor characterized the unscheduled cars as "junk vehicles."  Though he denied ownership of the vehicles at trial, he also explained that he did not list some of the vehicles in his Schedule B because he didn't know they were still in his name.  He said a couple of vehicles were buried in the ground and that they had been hauled away, either before or after he filed his petition, by FNBA.  He could not be specific as to the location of these vehicles.  He testified that some of them were either outside of his house or stored on a powerline easement.  According to the debtor, many people left junk cars on the powerline easement, which he referred to as "the lot."  He explained that he simply forgot to list the vehicles because they were junk, worthless, and he didn't see them every day.  He reiterated that he did not own the vehicles because they were not in his possession.

### D.     The Debtor's Testimony Regarding his Attorneys, the Trustee, and his Former Spouse.

At trial, the debtor asserted that Mr. Compton had told him not to worry about listing the vehicles in his schedules.  The debtor had an opportunity to cross-examine Mr. Compton and questioned him in this area repeatedly.  He asked Mr. Compton whether he recalled telling the debtor he didn't need to schedule any asset worth less than $10.00.  Mr. Compton said he did not recall such a conversation.  He further testified that the vehicles should have been scheduled, regardless of their value.

The debtor also suggested that Mr. Compton or attorney Jason Crawford were at fault for not amending his Schedules and Statement of Financial Affairs.  He stated that Mr. Crawford had failed to do his job, and "that is the bottom line."  He also accused Mr. Compton of making mistakes in the case.  He asked Mr. Compton if he recalled asking Mr.

11

Crawford to amend the Schedules.  Mr. Compton stated that he did advise Mr. Crawford that this should be done.

Finally, the debtor complained that nothing had gone right since "day one" in his divorce proceeding.  It had not gone the way he had hoped.  He contended the UST brought the adversary action "due to outside aid from other sources," specifically, his former spouse, whom he claimed was vindictive and should not be permitted to participate in the bankruptcy proceeding.

## DISCUSSION

Chapter 7 of the Bankruptcy Code embodies two ideals:  (1) it offers a "fresh start" to an individual debtor through the discharge of most debts, and (2) it provides for the equitable distribution of a debtor's assets among competing creditors.[31]  A chapter 7 discharge is governed by § 727, which directs that the court "shall" grant a debtor a discharge, with twelve exceptions.  Section 727 is construed liberally in favor of the debtor and strictly against the party objecting to discharge.[32]  However, the fresh start offered through discharge of personal liability is not a constitutional right,[33] but is instead reserved

---

[31] *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005)(citing *Stellwagen v. Clum*, 245 U.S. 605, 617 (1918)).

[32] *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010)(citing *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)); *see also First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986); *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 925 (B.A.P. 9th Cir. 1994).

[33] *United States v. Kras*, 409 U.S. 434, 446 (1973).

12

for the "honest but unfortunate debtor."[34]  Those seeking denial or revocation of discharge

must establish their claim under the preponderance of the evidence standard.[35]

## I.      False Oath under § 727(a)(4)(A).

Section 727(a)(4)(A) precludes discharge to a debtor who "knowingly and

fraudulently, in or in connection with the case . . . made a false oath or account."[36]  The UST

contends the debtor knowingly and fraudulently made false oaths in this case by failing to

schedule the Kingsmen property, the Morning Star property, and the undisclosed vehicles,

as well as failing to disclose the prepetition transfer of the two parcels of real property on his

Statement of Financial Affairs.  To prevail on this claim, the UST must establish four

elements, by a preponderance of evidence:  "(1) the debtor made a false oath in connection

with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and

(4) the oath was made fraudulently."[37]

### A.      False Oath Made in Connection with the Case.

The first element is satisfied here.  The debtor has made false oaths in connection with

his case.  At his September 27, 2013 § 341 meeting, the debtor affirmed that he had listed all

his assets and creditors.  Yet, he omitted his interest in several vehicles from his Schedules,

---

[34] *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)(quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[35] *See In re Retz,* 606 F.3d at 1196 (citing *In re Bernard*, 96 F.3d at 1281); *Searles v. Riley (In re Searles)*, 317 B.R. 368, 376 (B.A.P. 9th Cir. 2004)(citing *Grogan*, 498 U.S. at 289).

[36] 11 U.S.C. § 727(a)(4)(A).

[37] *In re Retz*, 606 F.3d at 1197 (quoting *Roberts v. Erhard (In re Roberts),* 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005)).

and, more significantly, failed to disclose his prepetition transfer of the two parcels of real property on his Statement of Financial Affairs. The quitclaim deeds introduced at trial establish that he transferred both parcels to Anna Byam on August 11, 2011, a date within two years of the filing of his petition. The debtor's Answer admits the two parcels were transferred on this date, and further avers that he believed he no longer owned the parcels at the time he filed his petition. Yet, at his earlier § 341 meetings, the debtor only revealed his interest in these properties upon questioning from the trustee and others in attendance. Further, he failed to even mention that he had transferred the Morningstar Property to Ms. Byam. At the § 341 meetings, he testified that he co-owned that property with Mr. Schuster, and attempted to qualify his interest as being something less than a true ownership interest. The quitclaim deed for the Morningstar property was not revealed until the day it became public record through its recording on February 27, 2014, the same day that oral argument was held on the motion to convert filed by the debtor's former spouse.

Ultimately, neither the UST nor the trustee challenged the validity of the quitclaim deeds. For this reason, the court finds that the debtor did not have an interest in the two parcels he transferred to Ms. Byam on the date he filed his petition, and his failure to list an interest in these properties on his Schedule A did not constitute a false oath. However, the quitclaim deeds unquestionably establish that he transferred his interest in the parcels within two years prior to filing his petition. His failure to list these transfers on his Statement of Financial Affairs constitutes a false oath.

14

The debtor concedes he did not list the transfers, but argues that he was not required to, because the transfers occurred more than two years after he signed and filed the document. This explanation is not believable. Question 10.a on the Statement of Financial Affairs asks the debtor to list "all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case."[38] The proper time frame – two years prior to the commencement of the bankruptcy case – is clear. The debtor filed his bankruptcy on July 18, 2013. Therefore, he was required to disclose transfers of any property occurring after July 18, 2011. The debtor transferred the two lots to Ms. Byam on August 12, 2011. The transfers clearly fell within the two year disclosure period. Further, the debtor was not forthcoming about either transfer. He only revealed his sale of the Kingsmen property to Ms. Byam on questioning at the September 27, 2013 § 341 meeting. At that same meeting, he indicated that he still had a co-ownership interest in the Morningstar property, and neglected to mention that this property had also been transferred to Ms. Byam in 2011. Under the circumstances, the court finds that the debtor's failure to list the transfers was intentional, rather than due to an honest oversight. His response to Question 10.a on his Statement of Financial Affairs was false.

As to the undisclosed vehicles, there is some confusion regarding exactly what vehicles the debtor owned as of his petition date. The confusion is largely created by the debtor's own testimony, which the court found evasive and combative. For example, the

---

[38] *See* UST's Ex. 5 (*Statement of Financial Affairs*), at 5 (emphasis in original).

debtor denied ownership of certain vehicles because they were in his wife's possession rather than his (the 1987 Oldsmobile and 1982 Ponitac J2000), and professed that he didn't have to list other vehicles because they had no value in his opinion.[39]  His denials of ownership based upon a lack of possession or value are spurious.  To the extent the debtor denies ownership of *any* additional, undisclosed vehicles, such argument is simply not credible, and is contradicted by his prior testimony at the § 341 meetings.  More to the point, his Answer admits ownership of several, but not all, of the undisclosed vehicles identified by the UST.  Based upon the debtor's Answer, the court concludes that as of the petition date, the debtor owned the following vehicles:  the 1987 Oldsmobile Cutlass, a 1976 Chevrolet Truck, a 1976 Ford,[40] and a 1982 Pontiac J2000.[41]  None of these vehicles were listed in the debtor's Schedule B.

The debtor claims that he was not required to list the additional vehicles because they were worthless, and Mr. Compton advised him not to list them.  At trial, the debtor repeatedly argued that Mr. Compton had told him that he need not list property worth less than $10.00.  Although Mr. Compton could not recall such a discussion, the excerpt of the

---

[39] *See Answer*, Ex. 2 at 2.  The debtor reiterated these opinions at trial.

[40] Mr. Compton inquired about a "78 Ford" in the creditors' meeting.  Based upon the pleadings in this case, it appears that the vehicle was the 1976 Ford truck.

[41]  The court finds insufficient evidence to establish the debtor's ownership of a 1983 Oldsmobile Cutlass, which he has consistently denied owning, as well as the 1996 GMC Sierra, or the 1978 Honda Accord.

16

November 1, 2013 meeting of creditors, UST Ex. 11, shows that he told the debtor, "If it's worth $10 - - or at least anything over 50 bucks, you ought to list."[42]

The record does not establish specific values for any of the omitted vehicles, but such an argument misses the point. The debtor filed his schedules on September 16, 2013, after the original creditor's meeting held August 16, 2013, and prior to the continued creditors' meeting set for September 27, 2013. The very first discussion of omitted vehicles is found in the November 1, 2013 meeting of creditors, wherein Mr. Compton examines the debtor on specific vehicles not listed in his Schedule B. Based upon this record, the debtor could not have relied on Mr. Compton's comments made at this meeting in deciding whether to he should have listed additional vehicles in his schedules, filed more than one month earlier.

On a much more fundamental level, the debtor was affirmatively required to list all vehicles that he owned as of the petition date regardless of value. "The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless relationship or holding; such a defense is specious."[43] It was not for the debtor to decide whether the bankruptcy estate would administer the vehicles. His omission of the undisclosed vehicles from his Schedule B constituted a false oath as well.

_____

[42] UST Ex. 1 at 15:4-5.

[43] *Gugino v. Clark (In re Clark)*, 525 B.R. 442, 461 (Bankr. D. Idaho 2015)(quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)); *see also Netherton v. Baker (In re Baker)*, 205 B.R. 125, 133 (Bankr. N.D. Ill. 1997)(collecting cases).

**B.      The Oath Related to a Material Fact**.

The second element requires that the debtor's false oath relate to a material fact.  A fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property."[44]  An omission or misstatement regarding an asset of little value can be material if it detrimentally affects the administration of the estate.[45]  The omission or misstatement may be material even if it does not cause direct financial prejudice to creditors.[46]

The debtor's false oaths regarding the transferred parcels of real property were material because they related to the existence and disposition of two of his most valuable assets, aside from his residence.  As for the unscheduled vehicles, although the trustee ultimately determined that they had no value to the estate, the debtor's omission of these assets was also material.  The fundamental purpose of § 727(a)(4)(A) is to insure that parties in interest "have accurate information [regarding the debtor's financial affairs] without having to conduct costly investigations."[47]  The debtor's nondisclosure of the vehicles detrimentally affected the trustee, UST, and creditors in this case, who were compelled to independently investigate the debtor's true financial condition due to the inaccuracies on his Schedules and Statement of Financial Affairs.

---

[44] *In re Retz*, 606 F.3d at 1198 (quoting *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 173 (B.A.P. 9th Cir. 2007), *aff'd* 578 F.3d 1167 (9th Cir. 2009)).

[45] *Fogal Legware of Switzerland, Inc. v Wills (In re Wills)*, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999); *see also In re Retz*, 606 F.3d at 1198.

[46] *In re Wills*, 243 B.R. at 63.

[47] *Id.*

18

### C.    The Oath was Knowingly Made.

The third element of § 727(a)(4)(A) is that the debtor acted knowingly in making the false oath.  A debtor acts knowingly where he or she acts "deliberately and consciously" when making the false oath.[48]  This element is established where the debtor deliberately and consciously signs the schedules and statements declaring that they are true and correct, and subsequently affirms the schedules and statements knowing that they are incomplete.[49]  Here, the debtor deliberately and consciously signed his schedules and the Statement of Financial Affairs, under penalty of perjury, declaring that they were true and correct.  He subsequently reaffirmed the accuracy of those documents at his September 27, 2013 § 341 creditors' meeting.  Further, his Answer admits that he filed these documents on September 17, 2013.[50]

In spite of his assertions as to the accuracy of these documents, the court concludes that the debtor was fully aware of his omission of the transfers from his Statement of Financial Affairs at the time he filed it.  First, the Kingsman and Morning Star properties represented the debtor's most significant assets aside from his residence.  Pragmatically, the Kingsman and Morning Star properties were more valuable than the residence because he had equity in those parcels.  Second, the debtor's shotgun and scattered denials regarding the reasons for his failure to disclose the transfers are not believable.   He contends he misunderstood Question 10.a because he calculated the two year period from the time he filled out and filed the document in September 2013, suggesting that the look back period

---

[48] *In re Retz*, 606 F.3d at 1198.

[49] *Id.*; *In re Khalil*, 379 B.R. at 173; *see also Gronlund v. Anderson (In re Gronlund)*, 2014 WL 4090433, at *8 (B.A.P. 9th Cir. Aug. 19, 2014).

[50] *Complaint* (ECF No. 1)(UST Ex. 1) at ¶ 7; *Answer* (ECF No. 17) (UST Ex. 2) at ¶ 1.

19

expired in September 2011. As discussed above, this explanation is unbelievable. Question 10.a is clear that the two year period is calculated from the date "immediately preceding the commencement of this case."[51] Third, the debtor's demeanor, evasiveness, and lack of specificity during examination at trial regarding the facts and circumstances surrounding the transfers, coupled with the timing of the post-petition recordings of the quitclaim deeds and the debtor's earlier failure to even reveal the transfer of the Morningstar property at his § 341 meetings, convince the court that his omission of the transfers was part of a calculated and deliberate scheme to exclude the properties from his bankruptcy.

As discussed in further detail below, the omission of the undisclosed vehicles from Schedule B presents a more difficult question. An appealing argument can be made that the debtor intentionally excluded the vehicles as part of an overall scheme to omit assets from his bankruptcy. His evasiveness and lack of credibility at trial support such a finding. However, the age, apparent poor condition, and lack of value of these vehicles, suggest otherwise. Even though the debtor never amended his schedules to include the omitted vehicles, the court is not convinced that he fraudulently omitted these "junk" vehicles from his Schedule B. Thus, no additional analysis is required with respect to these omitted assets.

### D.    The Oath was Fraudulently Made.

The fourth element of § 727(a)(4)(A) is that the debtor made the false oath fraudulently. A reckless disregard for the truth, by itself, is insufficient to establish this element.[52] The UST must show that: (1) the debtor made the omissions, (2) at a time when

---

[51] *Statement of Financial Affairs* (ECF No. 20)(UST Ex. 2) at 5.

[52] *In re Retz*, 606 F.3d at 1199.

20

he knew they were false, (3) and with the intention and purpose of deceiving creditors.[53]  As discussed above, the debtor omitted the vehicles from his Schedule B, and the transfers of the two lots in response to Question 10.a of the Statement of Financial Affairs.  These omissions were material, and with respect to the real property transfers, the debtor knew the omissions were false.  The remaining question is whether the omissions giving rise to the false oath were fraudulently made.

The UST must show that the debtor actually intended to deceive the creditors or trustee.[54]  A simple mistake made without such intent does not warrant denial of discharge, even where it pertains to a material misstatement.[55]  Fraudulent intent is typically "established by circumstantial evidence, or by inferences drawn from a course of conduct."[56]  Courts generally refer to the circumstances surrounding the conduct, and well recognized "badges of fraud" to ascertain a fraudulent intent, including:

> (1) a close relationship between the transferor and the transferee;
> (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the

---

[53] *Id.* (*citing In re Khalil*, 379 B.R. at 173).

[54] *Id.*

[55] *Merena v. Merena (In re Merena)*, 413 B.R. 792, 816 (Bankr. D. Mont. 2009), *aff'd*, 2009 WL 4914650 (B.A.P. 9th Cir. Dec. 10, 2009)("But if items were omitted by mistake, the declaration will not be deemed willfully false, and the discharge should not be denied because of it.")

[56] *In re Adeeb*, 787 F.2d at 1343 (*citing Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985)).

judgment; and (6) that the Debtor received inadequate consideration for the transfer.[57]

The circumstances surrounding the prepetition quitclaim transfers themselves, the debtor's omission of these transfers on his Statement of Financial Affairs, and the postpetition recordings of the deeds compel a finding of fraudulent intent. Numerous badges of fraud are present. The underlying transfers were made to an insider, the woman with whom the debtor is now living. While the specifics of the debtor's finances at the time of the transfers are unknown, there are suggestions that the debtor's business was failing, and that he was experiencing "hard times" at the time they were made.[58] Further, he was separated from his wife at the time of the transfers. The debtor's schedules reflect that the transferred properties would have been his most valuable assets, had he retained them. And, while the debtor maintains that he obtained adequate consideration for the transfers, there is no evidence to corroborate this fact. The lack of any specificity as to the amount of debt supposedly satisfied by these transfers, together with the debtor's evasiveness on the subject, cuts sharply against the bona fides of the transaction, as does Ms. Byam's failure to promptly record the quitclaim deeds. Moreover, the eventual timing of the recording of these deeds, confirms the debtor's fraudulent intent. One of the deeds was recorded shortly after the debtor's examination at the September 27, 2013 meeting of creditors, in which it was noted that the debtor still appeared to be record owner of the Kingsmen property. The other deed

---

[57] *In re Retz*, 606 F.3d at 1200 (*citing Emmett Valley Assocs. v. Woodfield (In re Woodfield),* 978 F.2d 516, 518 (9th Cir. 1992)).

[58] According to the debtor, Ms. Byam, despite being owed much more than the value of the properties transferred to her, gave him roughly $1,000.00 as part of this transaction because she knew he was undergoing hard times and thought she was getting the better part of the deal.

was recorded on the same day that the court heard a motion to convert, filed by the debtor's former spouse, and indicated its intent to grant that motion. No reason or explanation has ever been offered as to why Ms. Byam waited for two and a half years to record the quitclaim deeds or why they were recorded months apart. Indeed, the debtor never revealed that the Morning Star property had been transferred to Ms. Byam until after his case had been converted to chapter 7, and only after that quitclaim deed had been recorded.

The debtor's explanations as to why he omitted these transfers are unpersuasive. Throughout the trial, He was recalcitrant, evasive, and combative. Moreover, his explanations regarding the property transfers were inherently contradictory and not credible. On the one hand, he stated that he transferred the parcels to Ms. Byam to pay her for valuable services rendered. Yet, he also said the properties were both worthless, and further said Ms. Byam paid him some consideration for their transfer. Based upon the totality of the circumstances, and given the presence of multiple badges of fraud, the court finds that the debtor fraudulently omitted the two transfers of real property to Ms. Byam from his Statement of Financial Affairs.

Unlike the omission of the transfers of the real property, fraudulent intent cannot be found with respect to the debtor's failure to disclose the unlisted vehicles. Although the lack of value does not excuse him from disclosing his ownership in these vehicles, it weighs against any fraudulent intent. The trustee does not deny that the omitted vehicles were of limited value, and he has abandoned them based upon his independent conclusion that they cannot be sold for more than it would bring them to sale. Although it is not clear from the testimony at trial, the evidence strongly suggests that the vehicles are not operational. The

debtor testified that they are in various locations spread across town, including in his ex-wife's possession, on the his property, and on a utility easement.  Additionally, at the November 1, 2013 meeting of creditors, the debtor testified that the registration for the 1987 Oldsmobile Cutlass had expired in 2011, the 1976 Chevy had not been registered since 2002, and the 1978 Ford was last registered in 1996.

All of the circumstances surrounding the vehicles suggest that, while they remain in the debtor's name, they have been effectively discarded by him in any pragmatic sense. Moreover, the debtor did list two vehicles in his Schedule B; the 1999 Malibu valued at $2,100.00, and a "broken" 1980 Cutlass valued at $100.00.  It is unclear why the debtor listed these vehicles, and in particular the 1980 Cutlass, but not the other vehicles. Charitably construed, it suggests that the debtor believed that the 1980 Cutlass, even in its "broken" condition, had more value than the other omitted vehicles.  Disclosure of these two older vehicles suggests that the debtor was not fraudulently attempting to conceal his ownership of the other vehicles.

All four elements of § 727(a)(4)(A) have been satisfied as to the debtor's omission of the transfers of real property to Ms. Byam.  Accordingly, his discharge will be denied on this basis.  However, the UST has not established the requisite fraudulent intent necessary to deny the debtor his discharge under § 727(a)(4) for the failure to list the undisclosed vehicles in his Schedule B.

## II.    Failure to Explain a Loss of Assets under § 727(a)(5).

The UST also seeks denial of discharge under § 727(A)(5), which precludes discharge to a debtor who "has failed to explain satisfactorily, before determination of denial of

24

discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."[59]  To establish a claim under § 727(a)(5), the UST must show that:

> (1)  debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed . . . the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of assets.[60]

A debtor's failure to offer a satisfactory explanation for a loss or deficiency of assets, when called on by the court, is a sufficient ground for denial of discharge under § 727(a)(5).[61]

The UST challenges the debtor's failure to adequately explain the disposition of the undisclosed vehicles.  However, the court has found that the challenged vehicles remained titled to the debtor.  Moreover, Mr. Compton was able to locate, and evaluate, the vehicles. Based upon this record, the debtor continues to own the vehicles, and there has been no disposition of the vehicles for which he is required to account.  The record does not support a finding that the debtor failed to account for the vehicles, but rather he failed to disclose them.  Denial of the debtor's discharge under § 727(a)(5) is inappropriate.

**III.  Concealment of Property of the Estate under § 727(a)(2)(B).**

Under § 727(a)(2)(B), a chapter 7 discharge will be denied if the debtor "has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed" property of the estate "with intent to hinder, delay, or defraud a creditor or an officer of the estate" after the petition filing.  The UST

---

[59] 11 U.S.C. § 727(a)(5).

[60] *In re Retz*, 606 F.3d at 1205 (quoting *Olympic Coast Invest. Inv. v. Wright (In re Wright)*, 364 B.R. 51, 79 (Bankr. D. Mont. 2007)).

[61] *In re Retz*, 606 F.3d at 1205 (quoting *In re Devers*, 759 F.2d at 754)).

contends the debtor concealed the two lots and the unscheduled vehicles, after he filed his petition, with the intent to hinder, delay or defraud a creditor or officer of the estate.  To establish this claim, the UST must prove:  "(1) a disposition of property, such as a transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property."[62]  The subjective intent and means of proof  necessary to support denial of discharge under § 727(a)(2)(B) based upon an intent to defraud mirrors the examination conducted under § 727(a)(4).   However, proof of fraudulent intent is not required under § 727(a)(2)(B), and the discharge may be denied upon evidence of an actual intent to hinder or delay a creditor.[63]

As with claims under § 727(a)(4), the failure to list property of the estate in a debtor's schedules may suffice to establish concealment for purposes of § 727(a)(2)(B).[64]  The failure to disclose either the two lots of real property or the several older vehicles remains the basis for the UST's concealment claims.  The failure to list the real property, however, cannot support a claim under § 727(a)(2)(B) because the debtor did not own that property as of the petition date.  At trial, the UST conceded that it was not challenging the bona fides of the quit claim deeds given to Ms. Byam on August 12, 2011.  Because the debtor did not own the real property as of the petition date, he was not required to list the two lots in his schedules, and

---

[62] *In re Retz*, 606 F.3d at 1200 (citing *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)).

[63] *In re Gronlund*, 2014 WL 4090433 at *7.

[64] *Jacoway v. Svetc (In re Svetc)*, 521 B.R. 892, 909 (Bankr. W.D. Ark. 2014)("Failing to list assets on bankruptcy schedules and statements is tantamount to an act of concealment falling within the time frame required by either prong of § 727(a)(2)).  Even a voluntary, affirmative disclosure of property not included in the schedules "does not overcome Debtor's failure to schedule it."  *In re Gronlund,* 2014 WL 4090433 at *6 ("Schedules are paramount for disclosure to creditors in chapter 7. Creditors rely on accurate schedules to determine whether to file a proof of claim. Revealing a valuable asset during the § 341(a) meeting is not sufficient to notify creditors because they rarely attend.").

26

they never became property of bankruptcy estate.  It follows, then, that there was no concealment for purposes of § 727(a)(2)(B).

The UST's claim for denial of the debtor's discharge for concealment of the undisclosed vehicles necessarily fails as well, based upon the court's prior conclusion under § 727(a)(4) that the debtor lacked fraudulent intent with respect to these assets.  While the UST need only prove an intent to hinder or delay to sustain its concealment claims under § 727(a)(2)(B), the ages, condition, and lack of value of these vehicles militates against such a finding for the same reasons as set forth above.  Accordingly, the court finds that denial of the debtor's discharge under § 727(a)(2)(B) is not warranted.

## CONCLUSION

For the reasons stated above, the court finds that the debtor has knowingly and fraudulently made a false oath in this case by failing to disclose the transfers of the Kingsman and Morningstar properties made within two years from his petition date.  Accordingly, his discharge will be denied under § 727(a)(4)(A).

An order and judgment shall be entered consistent with this Memorandum Decision.

DATED:  October 22, 2015.

BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve:  Thomas Bufford, Esq. (for the UST)
         Frederico Anthonys, Pro Se Defendant
         SVS

27